Elizabeth H. DOLE, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

Ray TRUSTY, Lavada Trusty, and Randy Trusty, Individually, and Ray Trusty Hauling, Inc., also known as Ray Trusty Hauling, Defendants.

Civ. No. 88–2085.

United States District Court,
W.D. Arkansas,
Fort Smith Division.

March 2, 1989.

Daniel Curran, Office of the Sol., Dallas, Tex., for plaintiff.

Ernie Witt, Witt Law Firm, P.C., Paris, Ark., for defendants.

## MEMORANDUM OPINION

MORRIS SHEPPARD ARNOLD, District Judge.

This is an action brought by the Secretary of Labor to enforce the overtime and record-keeping provisions of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 207, 211(c), 215(a)(2), and 215(a)(5). This court has jurisdiction over this cause by virtue of 29 U.S.C. § 217, and there is no question that the Act applies since defendant [*] is engaged "in commerce," and does a gross annual business of not less than $250,000, as required by 29 U.S.C. § 203(s)(1).

### I.

It is conceded by all parties that prior to January, 1987, defendant paid its truck drivers, who hauled milk from producers to processing plants, a fixed sum for each trip, or partial trip, that they made, irrespective of the number of hours consumed by those trips. Though the length of the trips was subject to some variation, depending principally on how long it took the drivers to unload, drivers earned an average hourly rate of $6.00 to $8.00, a rate comparable to other truck drivers in the area, and certainly reasonably generous

---

[*] At trial, the court entered judgment in favor of defendants Lavada and Randy Trusty.

when one considers the general levels of wages and employment in Logan County where the defendant's business was located. The remuneration received, moreover, rather obviously exceeds that fixed by the minimum wage provisions of the relevant statute.

The Secretary nevertheless asserts that the FLSA has been violated because overtime has not been paid. 29 U.S.C. § 207(a)(1) provides that a covered employee who works more than forty hours in any week is entitled to be paid for the excess hours "not less than one and one-half times the regular rate at which he is employed." An important question in this case, therefore, is how the relevant drivers' "regular rate" is to be calculated.

■ For the period during which defendant's drivers were being paid by the trip, that question is definitively answered by the Secretary's regulation codified as 29 C.F.R. § 778.112, which fixes a method for determining the "regular rate" within the meaning of the statute when an employee agrees to do a certain job for a fixed sum. The regular rate, according to this regulation, the validity of which defendant concedes, is simply the price of the jobs completed during any workweek divided by the number of hours required to complete them. If the number of hours worked exceeds forty, then the employee is legally entitled to receive, in addition to the salary agreed to, half the regular rate for each such hour worked.

It follows from these considerations that defendant was in violation of the FLSA at least until early February, 1987, when Mr. Blankenship, one of plaintiff's witnesses, began his investigation of defendant's practices on behalf of the plaintiff.

## II.

Defendant does not seriously dispute this first conclusion. But defendant vigorously denies that it is liable thereafter, for it maintains that the arrangement with its drivers was changed in response to the remonstrations of the Department of Labor in February of 1987.

Defendant's records certainly do reflect at least an attempt to react to the requirements of FLSA. After being apprised of its violation of the Act, defendant adopted the device of waiting until the end of every workweek to see how many hours each driver worked and then, after the fact, choosing an hourly rate that would compensate each at exactly the trip rate formerly used, but would not require the payment of any overtime. In the spring of 1988, defendant adopted a second method of calculating pay. It compensated all of its drivers at a fixed rate of $5.50 per hour, but then added a bonus to each driver's pay to make the result come, again, to exactly the old trip rate. In other words, defendant adopted two methods, the first involving a variable hourly rate, the second a variable bonus, both retroactively arrived at, in order to duplicate the results generated by the trip-rate pay plan previously adhered to.

■ Plaintiff asserts that these devices are bare-faced ruses, mere bookkeeping shams resorted to in order to evade the clear prohibition of the relevant statute. That is certainly not an obviously incorrect view of the matter. But the court does not understand that plaintiff is arguing that, once a job-rate scheme of compensation has been entered into in ignorance of the implications of the wage-hour laws for that arrangement, the mode of compensation cannot be changed by contract to avoid those implications. If the Secretary is so arguing, the court declines to accept her argument. In other words, the court holds that the statute does not prohibit all private ordering responses to its overtime provisions.

The question in this case therefore reduces itself to what agreement, if any, the defendant came to with its employees after the investigation of defendant's wage practices was undertaken by the Department of Labor in 1987. The fact that the total compensation of each employee after this investigation remained the same as it was before is not necessarily helpful, and certainly not dispositive, in deciding this question. Indeed, this is exactly what one

would expect from rational economic actors. Certainly the defendants will have no incentive to offer more pay than previously; and there is evidence from which the court concludes that the employees were basically content with the amount of pay they were receiving. A restructuring of the employer-employee arrangement that would avoid the impact of 29 C.F.R. § 778.113, though not, of course, its mandate, would be exactly what one would predict would happen.

The evidence on what actual conversations took place between defendant and its truck drivers after the Labor Department's investigation is conflicting. Mr. Ray Trusty testified that more or less immediately thereafter the company started telling its drivers that they would be paid $5.50 an hour, that the time spent at the processing plants was "down time" and would not be compensated, and that a $70.00 bonus would be paid if the trucks were maintained in a clean condition so as to avoid complaints by health authorities. This testimony is not completely corroborated by that of defendant's drivers. The drivers who testified were all certain, however, that defendant Trusty had told them, at some point, that they would have to be paid thereafter on an hourly basis since the Department of Labor was insisting on it, though they did not agree as to what hourly rate was consented to, or, indeed, whether any specific sum was mentioned. More importantly, the employees indicated that they consented to a new hourly pay arrangement so long as the amount they received was not reduced from what it was before.

■ It is true that, during the time when the defendant was employing what the court has called the variable hourly rate scheme, no agreement was reached by the parties in advance as to what the rate of compensation would be. But if the parties could have reached an agreement in advance that would have avoided the impact of the relevant wage-hour regulation, what restraint does the FLSA put on them to keep them from agreeing in advance to a rate, to be determined at the end of the week, that would avoid that impact?

The answer to this question is contained in 29 C.F.R. § 778.114 which provides that such a contract is good only to the extent that it provides a variable straight time by reference to which an overtime rate is arrived at. The regulation seems rather clearly to render ineffectual the kind of contract entered into here.

■ Similar observations could be made about what the court has previously characterized as the variable bonus method of payment. The proof supports the conclusion, and the court finds, that in the spring of 1988 the parties agreed in advance to a flat hourly rate with a bonus to be paid, if the trucks were properly cleaned, in an amount necessary to insure that their pay would not fall below its previous level. No driver, in fact, ever failed to receive this "bonus," and the court finds that the real intention of the parties was to contract for a flat trip rate. Like the variable hourly rate method of payment, therefore, this kind of contract is specifically prohibited, in this instance by 29 C.F.R. § 778.502, dealing with "pseudo-bonuses," and especially by § 778.502(e) which states that the "general rule" is that "wherever the employee is guaranteed a fixed ... sum as his wages each week, no part of this sum is a true bonus and the rules for determining overtime due on bonuses do not apply."

What the court concludes from this analysis, therefore, is that while the parties were not prohibited from bargaining themselves back into their previous position, they could not do so by the means they chose. Evidently, they must choose an hourly rate in advance and change it only prospectively until, by trial and error adjustment, it more or less duplicates the results of the trip-rate arrangement. Why this cumbersome method has been thought necessary by Congress and the Secretary is not for the court to say. Perhaps it is not irrelevant to note that this method of reacting to the relevant regulations will produce, in the aggregate of cases, exactly the same results as those methods adopted by the defendant: The same amount of money

will pass from the same employers to the same employees; the same amount of work, indeed the identical work, will be performed; and the number of jobs available and those who are holding them will stay the same. But whatever the regulatory scheme chosen, the court is clear that the avoidance means adopted here violate the law.

### III.

The Secretary moved at the end of the evidence to amend her claim to assert that defendant's violation of the FLSA was "willful" so as to bring it within the extended statute of limitations provided by 29 U.S.C. § 255(a) for such violations. The court allowed the amendment but declines to find that defendant's violation was willful. There is no evidence whatever that he ever suspected a wage-hour violation before Mr. Blankenship's investigation; and the court has been at some pains to point out that the avoidance means chosen by Mr. Trusty, though not authorized by law, were not materially different from one that was. In such circumstances, it hardly seems reasonable to conclude that defendant "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA." *McLaughlin v. Richland Shoe Co.,* — U.S. —, —, 108 S.Ct. 1677, 1678, 100 L.Ed.2d 115 (1988), *quoting Brock v. Richland Shoe Co.,* 799 F.2d 80, 83 (3rd Cir.), *aff'd,* — U.S. —, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). The regulations on this matter are not simple and beyond the ken of the ordinary lay person.

The Secretary also moved to amend her complaint at the end of the evidence to include a prayer for liquidated damages under 29 U.S.C. § 216(b) and the court allowed the amendment. It is well settled that the court may decline to make an award of liquidated damages if convinced that the defendant, though he violated the law, nevertheless acted in "good faith." *See* 29 U.S.C. § 260. For the reasons indicated above in the discussion on the statute of limitations, the court declines the Secretary's invitation to assess liquidated damages against the defendant.

The court will therefore grant judgment to the plaintiff in the total amount of $24,928.14 and in the individual amounts indicated on page 2 of Government Exhibit 1.

An appropriate Order and Judgment will issue.